NOTICE
Decision filed 12/12/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230406-U

NO. 5-23-0406

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | White County. |
| | ) | |
| v. | ) | No. 22-CF-70 |
| | ) | |
| DANIEL W. LANNING, | ) | Honorable |
| | ) | T. Scott Webb, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Moore and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's sentence is affirmed where the trial court did not consider improper factors in aggravation or fail to give sufficient weight to mitigating factors when it sentenced defendant.

¶ 2    Defendant, Daniel W. Lanning, appeals arguing that the trial court committed errors during the sentencing hearing that require resentencing. For the following reasons, we affirm defendant's sentence.

¶ 3                                          I. BACKGROUND

¶ 4    On April 18, 2022, defendant was charged, by information, with four counts of criminal sexual assault, in violation of section 11-1.20(a)(4) of the Criminal Code of 2012 (720 ILCS 5/11-1.20(a)(4) (West 2020)). All four counts involved a juvenile, L.G., who was alleged to be over the age of 13 but under the age of 18, and further alleged that defendant held a position of trust,

1

authority, and supervision over L.G. as a house parent at the Baptist Children's Home and Family Services (BCHFS) in Carmi, Illinois, and the incidents occurred between March 31, 2022, and April 3, 2022. Count I alleged that defendant placed his fingers in L.G.'s vagina. Counts II and III alleged that defendant placed his penis in L.G.'s mouth, and count IV alleged that defendant placed his penis on L.G.'s vagina. At his first appearance, defendant stated he understood the charges and possible penalties related thereto, admitted he was recently hired for a position in Florida similar to what he had at BCHFS, and requested the appointment of counsel, which was granted.

¶ 5 On August 24, 2022, the State advised the court of an open plea in which defendant would plead guilty to counts I and II with sentences ranging from 4 to 15 years on each count that were mandatory consecutive. In exchange, the State would dismiss counts III and IV and not file additional charges in relation to the victim or other investigations that were occurring at the state's attorney's office. The trial court admonished defendant of the sentencing range and clarified that, due to the mandatory consecutive running of the sentences, the minimum sentence would be 8 years with a maximum of 30 years to be served at 85% with mandatory supervised release (MSR) set at 3 years to life. Defendant agreed that he understood. After further admonishments regarding voluntariness of defendant's plea and waiver of rights, the trial court asked the State to provide a factual basis.

¶ 6 The State's factual basis revealed that defendant worked as a house parent at BCHFS in Carmi, Illinois, which was a home for children who had a troubled life and whose parents could not currently care for their children. The State explained that a house parent was in charge of taking the children to school, generally supervising their daily activities, and acting as parents and caring for the children. The State advised the court that on April 10, 2022, Michelle Durham, an employee with the Illinois Department of Children and Family Services, contacted White County Sheriff's

2

Deputy Matt Wicker to speak about an adolescent being inappropriately touched by a worker at the home. Deputy Wicker met with Durham, who stated that L.G., a 14-year-old resident at BCHFS, reported being inappropriately touched by defendant, a house parent. During an interview, L.G. disclosed that the incidents by defendant occurred on multiple occasions and in multiple locations within BCHFS and at Social House (SH) between March 31, 2022, and April 3, 2022. L.G. stated that defendant hugged her, slapped her butt, placed his fingers in her vagina, and placed his penis in her mouth at various times on those dates. Defendant was later interviewed by Deputy Wicker at which time defendant admitted putting his fingers in L.G.'s vagina, putting his penis in her mouth, putting his penis on her vagina, and that L.G. put her hands on defendant's penis while they were in various rooms at the BCHFS and SH. The court found a factual basis existed and ordered a sex offender evaluation and a presentence investigation and report (PSI).

¶ 7     The sex offender evaluation report, prepared by Daniel A. Selock, was filed on October 24, 2022. The report noted defendant's convictions for two sexual offenses and that he was a 41-year-old who previously worked as a house parent at BCHFS. Selock's report noted statements from L.G. to the Guardian Center interviewer about the incidents revealing that: (1) L.G. did not trust defendant initially; (2) defendant would hug L.G. for no apparent reason; (3) after a few hugs and saying, "this is just what you needed," defendant smacked L.G.'s butt and squeezed it; (4) defendant kissed L.G. on the lips; (5) defendant moved L.G. away from security camera range at BCHFS and put his finger in L.G.'s vagina for about 10 minutes; (6) defendant pulled his pants down, took L.G.'s hand, and placed it on his penis to "jerk him off for 5-7 minutes"; (7) defendant fingered L.G.'s vagina and anus, and would squeeze and smack her butt; (8) defendant made L.G. suck his penis; (9) defendant would punish L.G. by having her suck his penis until she gagged; (10) defendant would ejaculate in L.G.'s mouth and she swallowed it; (11) defendant held L.G.

3

against the wall with her hands up, smacked her breasts and sucked them; (12) when L.G. refused to suck his penis or jerk him off, defendant said "at least watch me come"; (13) defendant told L.G. she was beautiful; (14) defendant rubbed L.G.'s clitoris with his penis but did not penetrate L.G.'s vagina; (15) L.G. stated she had no injuries or bleeding; and (16) defendant never used a condom.

¶ 8 Selock's report listed the other documents he reviewed, testing performed on defendant, and defendant's statements during his interview with Selock. During the interview, defendant explained that on the first day of the incidents, L.G. wrapped her arms around him and gave him a big hug. He stated that over a four-day span, L.G. asked him to touch her by rubbing her breasts and butt and fingering her vagina. She also asked him to masturbate in front of her and let her play with his penis by rubbing it and putting it in her mouth. He explained his actions by stating he simply "gave in to the temptations" of L.G.'s requests. He stated that L.G. asked him to make her "feel like my cousin made me feel" and while he did not know what her cousin did to her, L.G. guided the sexual behavior and defendant just "went along with what she wanted." Selock asked defendant if he was the actual victim, and defendant said yes, he was the victim.

¶ 9 During the interview, defendant admitted knowing the age of consent in Illinois was 18 and further stated that he felt guilty about having sex with a 14-year-old and "should not have given into the temptations." He stated that his first feeling of accountability was when he told his wife and she told him, "You should not have done that." Thereafter, defendant and his wife traveled to Florida to interview for jobs, for which they were hired. Defendant blamed himself for the sexual offenses and regretted his actions. When asked about the effect on L.G., defendant stated, "I am sure it added more trauma to her life, even though she asked for it. I damaged her

4

soul because I opened an old wound of hers made by her cousin." When asked to clarify, defendant did not elaborate.

¶ 10 Selock's report explained that criminogenic needs were characteristics, traits, problems, or issues of any individual that directly related to that individual's likelihood to reoffend. Selock found that defendant displayed three criminogenic needs: (1) antisocial attitudes; (2) a history of antisocial behavior, specifically noting defendant's "disregard for the feelings of his victims and rule of law pertaining to age of consent for sexual activities in Illinois"; and (3) "low self-control around the minors" at BCHFS.

¶ 11 Selock did not recommend drug, alcohol, or mental health treatment based on scores from defendant's testing but did recommend treatment for depression. Defendant's testing revealed "distorted thought about rape and the feelings of females." Based on the testing, Selock believed defendant was a moderate level of risk to sexually reoffend. He felt that defendant "was predatory on a young female with deviant motivations and wanted to exert power and control over her. He appeared to be self-centered and acted from a position of authority." Selock further noted that defendant "denied taking responsibility for the sexual acts and was ambivalent with the truth, even though he was the adult in the situation." Selock recommended sex offender treatment, stated the community would not be safe in defendant's presence, and opined that defendant was likely to reoffend without treatment. The report noted, *inter alia*, that defendant engaged in a sexual offense with a person of unequal intelligence and emotionality, had a deviant sexual preference for sadism (spanking), had three criminogenic needs, a low level of self-control, and used sex with a 14-year-old female to cope with loneliness or stress. Selock also recommended a safety plan to prevent defendant from being alone around children or minors because Selock felt defendant was unsafe in their company without another adult present.

¶ 12    Defendant's PSI revealed no prior criminal history. Defendant was married but unsure of the status of that marriage. His only debt was a 2012 vehicle. His employment prior to BCHFS included working for Compact Family Services in Arkansas in 2019, as a custodian for the East Peoria School District for two to three years, and a four-year internship at Teen Challenge. Other employment included jobs at Casey's General Store, Newell Furniture, and Hydrocam Industrial Services. No physical or mental issues beyond diabetes and high blood pressure were reported and those were controlled with medications.

¶ 13    The sentencing hearing was held on November 3, 2022. The parties agreed they reviewed the PSI and defense counsel noted a few revisions that included a spelling error and updated the court that the 2012 vehicle was sold, defendant received divorce papers from his wife and no longer took omeprazole. The parties also agreed they reviewed the sexual evaluation report. Defendant disputed saying he was a victim during the interview. The court noted the claim but stated that since Selock could not be cross-examined, the court would not amend the report.

¶ 14    The State called Sheriff's Deputy Matt Wicker to testify about his interviews with L.G. and defendant. He stated that during L.G.'s interview, she was both "timid and forthcoming with information." L.G. told Deputy Wicker that the first incident occurred at the Ballard Cottage on March 31, 2022, when defendant slapped L.G. on her butt and then inserted his finger in her vagina. Other incidents occurred on April 1, 2022, through April 3, 2022, in multiple places throughout the home, including the basement, gym kitchen, and SH loft. All incidents were off camera because there were no cameras in those locations. L.G. told Deputy Wicker that defendant would force her to give him "blow jobs," ejaculated a few times, spanked her, put his finger in her vagina, and put his penis on her vagina. L.G. relayed to Deputy Wicker that she felt it was easier for defendant to

6

do this to her than to other girls. The officer stated that L.G. never indicated that she initiated the acts.

¶ 15    Deputy Wicker also interviewed defendant, and defendant described his feelings toward spanking as "more of a fetish and feeling of power and control." According to Deputy Wicker, the interview statements from defendant and L.G. were "pretty consistent" regarding the different acts, places, and times. The only difference was that defendant stated that L.G. initiated the incidents by coming on to him. The officer stated that defendant admitted to the sexual acts on every day between March 31 to April 3, 2022, was open and forthcoming during the interview, and acknowledged his behavior. Deputy Wicker clarified that defendant never put his penis in L.G.'s vagina; he only put his penis on L.G.'s vagina. He also confirmed that L.G. was not physically harmed or physically injured from these incidents.

¶ 16    The State also called White County Sheriff Sergeant Justin Spencer. Sergeant Spencer testified to participating in 10 interviews with seven different female juvenile residents of BCHFS, four of whom disclosed information significant to the investigation. He discussed K.B., who was around 13 years old and stated that defendant made her uncomfortable when he touched her arms and shoulders, held her hand, and picked her up. K.B. alleged that, at some unknown time, defendant threatened to "beat the shit out of her." Sergeant Spencer also addressed E.H., who was 13 or 14 years old and said defendant spanked her twice as a form of punishment. Sergeant Spencer stated that E.H. told him that defendant gave the option of being disciplined through either spanking or grounding and she chose to be spanked. Sergeant Spencer also testified about S.H., who was 14 years old and told him that one time defendant walked up and "smacked her butt." S.H. further revealed that defendant made sexual jokes and references. One time, defendant said, "you like that white stuff," which S.H. thought was a reference to semen. Another time, defendant

7

stated, "you know you like to have your hair pulled." Finally, Sergeant Spencer discussed O.J., who was 12 years old and said that defendant spanked her twice. She told the officer that she told defendant not to touch her and he apologized. After the second time, O.J. struck defendant's hand and told him to stop. Defendant told her that she was not allowed to strike him and threatened to harm her if she disclosed that information. None of the girls reported being physically harmed or having physical injuries after these incidents.

¶ 17    Defendant's father testified in mitigation. He explained that defendant was a "normal child," never had any problems, and had no trouble in school. Defendant's father observed defendant and his wife of 13 years together often and they appeared to have a good marital relationship. In speaking with his son during the pendency of the case, he stated that defendant expressed remorse. Defendant's father stated that his son seemed serious about making changes in his life and wanted to move back to Missouri to help his father on the farm.

¶ 18    The State sought a 13-year sentence on each count. The State argued that this was a very serious matter because it involved someone in a parental position to a vulnerable child. The State urged the court to look at defendant's actions because the series of these actions made it appear as if defendant was constantly putting himself in a position to seek prey. The prosecutor argued that the sex offender evaluation indicated defendant was "constantly" saying he "gave into temptation," "she initiated" the actions, and that defendant was really the victim because "she led me down this road." The State suggested that defendant did not think the victim would ever speak out, and further suggested defendant was grooming other children.

¶ 19    The State pronounced that, "[a]side from murder, this is about as serious as it gets." The State noted defendant's lack of childhood trauma and stated this made the situation "pure evil behavior from him himself." The sex offender evaluation showed defendant had low self-control,

8

that slapping butts was a form of sadism, and defendant was blaming the victim. Although defendant did apologize, it could not be said that defendant took full responsibility when he continued to assert that L.G. was the initiator of these acts. The State also characterized the fact that defendant knew L.G. was previously abused by her cousin as "mak[ing] it even worse." The State also referenced the conclusion that defendant was classified as a moderate risk to reoffend, and treatment was necessary for defendant to be safe in the community. As far as statutory factors in aggravation, the State argued that defendant's conduct caused or threatened serious harm and that the sentence was necessary to deter others.

¶ 20    In response, defense counsel agreed this was a very serious case, but noted defendant was remorseful for his actions and understood that he needed to change. Defense counsel pointed out misstatements by the State, one being that defendant's behavior of spanking was grooming behavior and used language like "grabbing butts" because that sounded worse than slapping butts. Defense counsel disputed that defendant had not taken responsibility or acknowledged what he did was wrong. Counsel noted that the State referenced portions of the sex offender evaluation regarding defendant's lack of responsibility but argued that other portions of the evaluation revealed that defendant was sorry for his actions. Counsel further noted that defendant took responsibility for the actions when he spoke with Deputy Wicker. Counsel noted defendant was scored as a low risk in most of the testing, but the evaluator placed him middle range because defendant did not grasp the seriousness of the behavior, did not fully understand his role in the incidents, and answered questions in a manner consistent with sexual offending myths.

¶ 21    Turning to statutory factors in mitigation, defense counsel argued that defendant's conduct did not cause or threaten to cause serious physical harm, although defendant recognized that his conduct caused emotional damage and harm. Defense counsel noted that defendant had no criminal

9

history and argued that the conduct was the result of circumstances unlikely to occur again because defendant would never be allowed to work with youth in the future, was remorseful, and was open to treatment. Defense counsel noted the evaluator's report recommended treatment at Big Muddy River Correctional Center and agreed with the recommendation. Counsel asked the court to issue the minimum sentence of eight years in prison, which would provide sufficient time for defendant to complete the sex offender treatment programs at Big Muddy.

¶ 22 Following argument, defendant provided a statement in allocution in which he apologized for the damage he did to L.G. and the others he hurt. He also asked for forgiveness. Defendant stated that he was sorry for everything and wished he had never done it.

¶ 23 A victim impact statement from L.G. was read by victim advocate Candace Masterson. The statement indicated that when L.G. first met defendant, she was suspicious of him and then three weeks after L.G. arrived at BCHFS, she was sexually assaulted by defendant. When she asked defendant "why her?" he stated that she "was the one who wanted it." The statement described L.G. being frightened and emotionally hurt. She stated she suffered panic attacks and fits of rage when she thought about what happened. She described the incidents and places where they occurred, noted that security cameras were in none of those places, and revealed that she only told a different house parent after defendant and his wife left for Florida. The statement revealed current issues with trusting people and paranoia that defendant would get out of jail and hurt her. She expressed a desire for defendant to be permanently incarcerated so he could not hurt anyone else.

¶ 24 In announcing its sentence, the court discussed the minimum sentence stating, "I think if we look at the minimum, a minimum would be someone who doesn't have a criminal history," which the court noted would fit defendant. The court further noted that the minimum would be

applicable to someone who was low risk, a victim whose age was closer to the age of majority, noting the "gray line" between someone 13 years old and someone one month younger than 18, and thought that was "pretty significant." It explained that the age was a transitional time when those juveniles were trying to figure out what it is like to become a man or woman and what boys and girls liked about each other so "it's a very difficult time." The court stated that it viewed the case as, "the closer we get to that 13, I think the more egregious the act is" and that it was in the court's discretion to view it that way. The court stated, "[T]he more egregious I see that because that time frame is really critical to both boys and girls." The court noted the victim was 14 years and 10-11 months old at the time of the crimes, which was on the lower end of the spectrum, so it took that fact into consideration.

¶ 25 The court also noted defendant's supervisory role at BCHFS, stating defendant was not a public-school official dealing with average ordinary children; instead, defendant was a parental figure at a children's home for at-risk kids who were already more vulnerable than most children. The court emphasized, "[a]ll 14-year-old girls are vulnerable, but in this case, [L.G.] was extremely vulnerable" and defendant should have been aware of that additional vulnerability. The court considered those two factors as aggravating in addition to the statutory factors considered.

¶ 26 When turning to mitigation factors, the court briefly agreed that defendant's conduct neither caused nor threatened serious physical harm to another, but found there was "an incredibly serious harm that's at play here." The court suggested that "in some ways these types of cases [were] more serious than murders because she's going to have to deal with this situation for the rest of her life. *** You have forever seared that in her mind." The court noted defendant had no prior criminal history, which was "definitely a factor in mitigation."

¶ 27    The court agreed with the State's argument that a sentence was necessary to deter others, explaining again that defendant was entrusted to take care of the "most vulnerable" and "in some trivial-type manner you ran around slapping little girls on the butt, finding yourself alone with little girls." The court doubted that being alone with the girls was "accidental" and stated that behavior "cannot be tolerated in our society." It noted that defense counsel predicted this would never happen again, but the court stated, "I can only predict the future based upon what I've seen in the past, and what I'm seeing in the most recent past isn't very good on your behalf."

¶ 28    The court acknowledged that defendant did take responsibility, but found his responsibility limited. While defendant admitted that he should not have done what he did, the court noted that defendant also said that L.G. "was kind of in this too." The court stated that as a 40-year-old man, defendant should have walked away no matter what actions, if any, she took first. The court noted the evaluator had reservations saying defendant was low risk and the court agreed. It stated that it should have been a time in L.G.'s life when she played with her friends, learned what it was like to become a young woman, and "not to be molested by some deviant house parent at this place where she goes to find help." The court also noted defendant's accountability as "yeah but," rather than taking full responsibility. In continuing to analyze defendant's lack of responsibility, the court stated that while defendant stood in court taking full responsibility similar statements were made by other defendants. Thereafter, the court sentenced defendant to 11 years in prison on each count with 3 years to life MSR.

¶ 29    On November 4, 2022, defendant sent correspondence to the trial court requesting to withdraw his guilty plea and go to trial claiming ineffective assistance of counsel. Defendant also sent correspondence dated November 11, 2022, requesting a reduction in his sentence. The reduction in sentence correspondence clarified that defendant was no longer requesting to

12

withdraw his guilty plea. Both requests were filed on November 21, 2022. New counsel was appointed to assist defendant because his previous counsel, Shinkle, no longer worked in White County.

¶ 30    Postsentencing counsel filed an amended motion to reduce sentence. Counsel argued that the sentence was excessive for someone with no criminal history. The amended motion further contended that the court's consideration of the victim's age and defendant's position as a house parent was improper double enhancement.

¶ 31    A hearing on the postsentencing motion was held on June 5, 2023. Counsel formally withdrew defendant's motion to withdraw his guilty plea and stated it would be proceeding solely on the amended motion to reduce sentence. Counsel's argument mirrored the amended motion. In response to the improper double enhancement argument, the State relied on *People v. Saldivar*, 113 Ill. 2d 256, 269 (1986), that stated, "Certain criminal conduct may warrant a harsher penalty than other conduct, even though both are technically punishable under the same statute." According to the State, "sliding scale" determines the sentencing for a specific case under specific circumstances. The State then summarized the factors that the court considered in determining where defendant landed on its sliding scale, including: (1) defendant's lack of criminal history, (2) defendant being moderate risk of reoffending, and (3) L.G.'s age placing her at the younger end of the spectrum. The State also argued that defendant's position of being a house parent in charge of a 14-year-old girl's care was more egregious than a manager of an underage employee at a McDonald's. Finally, the State argued that the court's consideration of the victim being "extremely vulnerable" was a relevant aggravating factor.

¶ 32    The court noted that it had discretion within the 4- to 15-year sentencing range and that it was allowed to look at the individual circumstances of each case to determine a sentence within

that range. The court compared its consideration of the victim's age and the type of supervisory position to different severities of great bodily harm taken into account in other types of cases. With respect to defendant's criminal history, the court explained that defendant did not get the maximum sentence because his criminal history "was rather sparse." Turning to defendant's "supervisory role," the court noted that these were "troubled young ladies," and agreed with the State that this situation was different than if defendant were a supervisor at McDonald's. The court commented that if defendant had been an ordinary guy on the street, he probably would not have gotten the same sentence. The court also noted that, in that situation, the sentence would not be the same because it would not be as high as a Class 1 felony. The court stated that it looked at all of the circumstances of the offenses in addition to the evidence, believed that 11 years in prison for each conviction was reasonable, and denied the motion to reduce defendant's sentence. Defendant appeals.

¶ 33                                    II. ANALYSIS

¶ 34    On appeal, defendant argues that the trial court's 22-year sentence was excessive because it considered improper factors in aggravation, including L.G.'s age, defendant's parental role to L.G., L.G.'s extremely vulnerable status, and the court's personal beliefs about sex offenders. Defendant further argues that the court did not sufficiently consider his acceptance of responsibility, the low to moderate risk level classifications that he would reoffend, and defendant's lack of criminal history. Finally, defendant argues that his sentence was excessive where the court failed to consider defendant's lack of criminal history, likelihood of reoffending, and his rehabilitative potential.

¶ 35    In addition to addressing the merits of defendant's arguments, the State argues that defendant's arguments were twice forfeited: once when no objection was raised at sentencing, and

14

later, when they were not included in the postsentencing motion. Defendant disputes both forfeitures, but requests, in the event the arguments were forfeited, second-prong plain error review. We address the procedural issues first as they shape the boundaries of our review on appeal.

¶ 36 It is well-settled that to preserve an issue for review, trial counsel must object at the time of the error and include the issue in a posttrial motion. *People v. Thompson*, 238 Ill. 2d 598, 611 (2010) (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)). Failure to properly preserve an issue "forfeits any review of the error." *People v. Jackson*, 2022 IL 127256, ¶ 15. Here, no objections were raised during the court's proclamation of defendant's sentence. As such, our first consideration is whether defense counsel's failure to object during the pronouncement of the sentence precludes review of any issues that were raised in the postsentencing motion.

¶ 37 Defendant argues that any objection would have " 'fallen on deaf ears' " and therefore, any objection during the court's explanation of defendant's sentence would be futile and potentially prejudice the court against the defendant. See *People v. Hanson*, 238 Ill. 2d 74, 118 (2010) (quoting *People v. McLaurin*, 235 Ill. 2d 478, 488 (2009)). While we disagree that objections during sentencing always result in prejudice against the defendant, we find sufficient reasoning to overlook the lack of any objection. See *People v. Saldivar*, 113 Ill. 2d 256, 266 (1986). In *Saldivar*, the court specifically found that the issue was not forfeited because "it was not necessary for counsel to interrupt the judge and point out that he was considering wrong factors in aggravation" at sentencing. *Id.* As such, we follow the *Saldivar* court's lead and find that the errors were not forfeited due to a failure to object during the court's pronouncement of sentence.

¶ 38 However, many of the alleged errors raised on appeal were not included in the postsentencing motion either. These unmentioned arguments contend that: (1) the court

improperly considered the victim's "extremely vulnerable" status as a factor in aggravation; (2) the court improperly relied on its own personal beliefs about sex offenders in rendering the sentence; (3) the court did not sufficiently consider defendant's acceptance of responsibility; (4) the court did not sufficiently consider the low to moderate risk levels related to defendant's likelihood to reoffend; and (5) the sentence was excessive where the court failed to consider defendant's rehabilitative potential, lack of criminal history, and risk assessment.

¶ 39     Forfeiture may be avoided if plain error review is requested. *McLaurin*, 235 Ill. 2d at 495; see also Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The plain-error doctrine is a narrow and limited exception that bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) regardless of the closeness of the evidence, the error is serious, affected the fairness of defendant's trial, and challenged the integrity of the judicial process. *People v. Allen*, 222 Ill. 2d 340, 351 (2006) (citing *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005)). The burden of persuasion lies with the defendant under both prongs of plain error (*People v. Lewis*, 234 Ill. 2d 32, 43 (2009)) and failure to establish plain error requires a court to honor the procedural default. *People v. Bannister*, 232 Ill. 2d 52, 65 (2008).

¶ 40     Usually, the first step in the plain error analysis is to determine whether error occurred. *People v. Lovejoy*, 235 Ill. 2d 97, 148 (2009). However, defendant requested only second-prong plain error review, which typically requires structural error. *People v. Jackson*, 2022 IL 127256, ¶ 28. A structural error requires automatic reversal if it renders a criminal trial fundamentally unfair or unreliable in determining guilt or innocence. *Id.* Second-prong plain error is a high hurdle and "errors that are reviewable under the second prong of the plain error rule are rare." *People v. Johnson*, 2024 IL 130191, ¶ 53. However, the burden becomes insurmountable when, as here, the

16

arguments raised are based solely on consideration of improper sentencing factors. *Id.* ¶ 92. (holding that consideration of improper sentencing factors may not be reviewed under second-prong plain error). As only second-prong error was alleged, and it is inapplicable to the issues raised here but not before the trial court, we must honor the forfeiture as to claims of error listed above.

¶ 41    This leaves three issues for consideration on appeal: (1) whether the court improperly considered L.G.'s age as an aggravating factor when age is inherent in the offense; (2) whether the court improperly considered defendant's parental role to L.G. as an aggravating factor when defendant's status was inherent in the offense; and (3) whether the trial court failed to provide sufficient weight to defendant's lack of criminal history as a factor in mitigation.

¶ 42                               A. The Victim's Age

¶ 43    Defendant was charged with criminal sexual assault, in which the State alleged the victim was at least 13 years of age and under 18 years of age, defendant was over 17 years of age, and defendant held a position of trust, authority, or supervision in relation to the victim. See 720 ILCS 5/11-1.20(a)(4) (West 2020). He argues that the trial court improperly considered L.G.'s age as a factor in aggravation which was improper double enhancement.

¶ 44    "A double enhancement occurs when either (1) a single factor is used both as an element of an offense and as a basis for imposing a harsher sentence than might otherwise have been imposed, or (2) the same factor is used twice to elevate the severity of the offense itself." *People v. Guevara*, 216 Ill. 2d 533, 545 (2005). "Generally, a factor implicit in the offense for which the defendant has been convicted cannot be used as an aggravating factor in sentencing for that offense, absent a clear legislative intent to accomplish that result." *People v. Ferguson*, 132 Ill. 2d 86, 97 (1989). The reasoning for the double enhancement rule is "premised on the assumption that

17

the legislature considered the factors inherent in the offense in determining the appropriate range of penalties for that offense." *People v. Rissley*, 165 Ill. 2d 364, 390 (1995). We review complaints of double enhancement *de novo*. *People v. Phelps*, 211 Ill. 2d 1, 12 (2004).

¶ 45 The preeminent case involving age and double enhancement is *People v. White*, 114 Ill. 2d 61 (1986). In *White*, the victim's age was a statutory aggravating factor and therefore the victim's age could not form the basis for an extended-term sentence. *Id.* at 66. While *White* is distinguishable here because L.G.'s age was not used to as the basis for an extended-term sentence, we note the courts are split as to whether age, which is an inherent factor of the crime, can ever be considered.

¶ 46 Some courts interpret *White* to extinguish any reliance on age of the victim as an aggravating factor is improper where the age of the victim is an element of the offense. See *People v. Calva*, 256 Ill. App. 3d 865, 874 (1993); *People v. Donald*, 222 Ill. App. 3d 794, 802 (1991); *People v. Edwards*, 224 Ill. App. 3d 1017, 1033 (1992). Other courts found—based on the principle that the court can consider the nature and circumstances of the offense, including the nature and extent of each element of the offense—that the court can consider the specific age of the victim as a nature of the case. See *People v. Spicer*, 379 Ill. App. 3d 441, 468 (2007); *People v. Thurmond*, 317 Ill. App. 3d 1133, 1144-45 (2000); *People v. Raney*, 2014 IL App (4th) 130551, ¶ 37; *People v. Wyatt*, 186 Ill. App. 3d 772, 780 (1989).

¶ 47 Upon review of the case law, we find the latter more persuasive. This court has also followed the latter path in the past. See *People v. Newlin*, 2014 IL App (5th) 120518, ¶ 22 ("a trial court may consider the nature and circumstances of an offense, including the nature and extent of each element of the offense as committed by the defendant"); *People v. Sutton*, 2022 IL App (5th) 190160-U, ¶ 37. Further, the Illinois Supreme Court has long held that consideration of the degree

18

of harm, even where serious bodily harm is arguably implicit in the offense, is allowed. See *Saldivar*, 113 Ill. 2d at 269. *Saldivar* also confirmed allowance to consider the seriousness, nature, and circumstances of the offense along with the nature and extent of each element of the offense. *Id.* at 268-69.

¶ 48    "The rule that a court may not consider a factor inherent in the offense is not meant to be applied rigidly, because sound public policy dictates that a sentence be varied in accordance with the circumstances of the offense." *People v. Cain*, 221 Ill. App. 3d 574, 575 (1991). A sentencing court may consider "whether the victim is particularly young" even if the victim's age is an element of the sexual assault count for which defendant was convicted. *Thurmond*, 317 Ill. App. 3d at 1144. In *Thurmond*, the victim was a 12-year-old girl who was removed from her mother by the Illinois Department of Children and Family Services and was living with her aunt. *Id.* at 1136. The aunt's husband was the defendant. *Id.* In reviewing the defendant's claim that the trial court erred by considering the victim's age because it was an element of the charge, the *Thurmond* court noted, "there is a difference between being under age 18 and being significantly under age 18" as well as a difference between "being a family member and being a father." *Id.* at 1144. The court provided an example which found that "an act of sexual penetration on a 17-year-old family member is reprehensible ***, [but] an act of sexual penetration on a 7-year-old family member is even more reprehensible." *Id.*

¶ 49    Here, and similarly to *Thurmond*, the trial court noted that L.G. was almost 15 and therefore was on the lower end of the age range delineated by the statute. The court also noted the wide discrepancy between L.G.'s age and defendant's age of 41. We cannot find that the trial court's consideration of where L.G. personally landed on the statutory spectrum, or the difference between L.G.'s age and defendant's age, to fashion an appropriate sentence was erroneous.

¶ 50                          B. Defendant's Authority Over L.G.

¶ 51    Defendant raises a similar claim of double enhancement based on the trial court's comments about defendant's authority over L.G. We again note that the Illinois Supreme Court has long held that consideration of the degree of harm, as well as the seriousness, nature, and circumstances of the offense, including the nature and extent of each element of the offense, is allowed. *Saldivar*, 113 Ill. 2d at 268-69.

¶ 52    It is undisputed that defendant's authority over L.G. was an element of the crime for which defendant was convicted. Here, the court commented that defendant's authority as a house parent over L.G. was substantially different from other relationships between juveniles and adults, even referencing that of a teacher and a student, as well as a juvenile and supervisor relationship. We believe the court's statements are consideration of the circumstances of the offense. While the evidence failed to reveal the exact reason why L.G. was placed at BCHFS, defendant's statements during the sex offender evaluation provide insight into L.G.'s past.

¶ 53    Defendant reported to Selock that L.G. asked defendant to make her "feel like my cousin made me feel." Defendant told Selock that "he did not know what her cousin did to her[,] so he let her tell him what to do" and "she guided their sexual behaviors." Defendant apprised Selock that L.G. "asked" him to "touch her by rubbing her breasts and butt; to finger her vagina, for him to masturbate in front of her, for her to play with his penis, and to rub it and put it in her mouth." Defendant stated that "he just went along with what she wanted."

¶ 54    Defendant's statements allow this court, as well as the trial court, to infer that previous instances of sexual abuse occurred to L.G., regardless of whether that was the basis of her residence at BCHFS. However, an inference is unnecessary because defendant specifically acknowledged that his action created "*more* trauma" (emphasis added) for L.G. because he "opened an old wound

20

of hers made by her cousin." As such, defendant as a house parent at BCHFS was aware of L.G.'s past circumstances and, despite this knowledge, continued to sexually abuse L.G. multiple times over a four-day period.

¶ 55    The evidence also revealed that defendant's position at BCHFS provided him with knowledge of where the security cameras were placed at BCHFS to avoid discovery of his acts against L.G. Additional evidence revealed that defendant's position at BCHFS provided him with information as to when L.G. would leave her room, and authority to direct the behavior and actions of other children, and to discipline children through "spanking" who failed to follow his directives.

¶ 56    We cannot find that the trial court's statements were anything more than notations of the evidence revealing defendant's dominance over L.G., as well over the other children at BCHFS, all of whom may have been more vulnerable simply by living at BCHFS. L.G.'s vulnerability, from the past experience with her cousin, was more than sufficient to support the trial court's assessment. Further, vulnerability is not an element of the crime. Therefore, we cannot hold that the trial court's remarks about the context of defendant's authority over L.G. were erroneous or improper considerations of an element of the crime.

¶ 57                              C. Defendant's Lack of Criminal History

¶ 58    Finally, defendant contends the trial court erred by failing to place sufficient weight on defendant's lack of criminal history. A trial court's sentencing decision will not be disturbed absent an abuse of discretion. *People v. Stacey*, 193 Ill. 2d 203, 208-09 (2000). An abuse of discretion is found where the sentencing court's "ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Hall*, 195 Ill. 2d 1, 20 (2000).

21

¶ 59 Here, the record is replete with the court's acknowledgment of defendant's lack of any criminal history. In fact, the court went so far to say that such mitigating evidence would usually put a defendant in the lower end of the required sentencing range. However, even if the court had not specifically mentioned defendant's lack of criminal history, "if mitigating evidence is presented at the sentencing hearing, a reviewing court presumes the trial court took that evidence into consideration" absent evidence to the contrary. *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 29. No evidence to the contrary is presented here. A trial court must base its sentencing on the particular circumstances of each case. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123. A court should also consider "defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Id.*

¶ 60 Defendant's argument also ignores that the most important sentencing factor is the seriousness of the offense and that the presence of mitigating factors does not require a minimum sentence or preclude the court from imposing the maximum sentence. *People v. Contursi*, 2019 IL App (1st) 162894, ¶ 25. The trial court twice considered defendant's lack of criminal history as a factor in mitigation. However, the trial court also considered defendant's demeanor, and general moral character. The court considered defendant's statement of responsibility and remorse but felt that defendant's responsibility "only goes so far" and further referenced it as a "yeah, but." The court also noted that defendant admitted he performed the acts but indicated L.G. "was kind of in this too." A trial court is allowed to rely upon defendant's lack of remorse at sentencing. *People v. Cross*, 2021 IL App (4th) 190114, ¶ 144.

¶ 61 The court also considered defendant's moral character and the risk of reoffending, stating, "She's a girl; 14 years old. I don't care if she rips your clothes off, which she did not do. You're a man; 40 years old. You walk away. What part of that do you not understand?" Contrary to

22

defendant's contentions, the trial court considered defendant's lack of criminal history; however, the court considered other evidence submitted at sentencing that it believed outweighed defendant's lack of criminal history, which was within the court's province. See *People v. Markiewicz*, 246 Ill. App. 3d 31, 55 (1993) (a court may not disregard mitigating evidence but does determine the weight to attribute to such evidence). The weight to place on that evidence is at the discretion of the trial court. *Stacey*, 193 Ill. 2d at 209. This court will not reweigh the evidence. *Id.* Here, we cannot find that it was an abuse of discretion for the trial court to afford less weight to defendant's lack of a criminal history and give greater weight to the other evidence presented at sentencing.

¶ 62                                    III. CONCLUSION

¶ 63    For the above-stated reasons, we affirm defendant's 22-year sentence imposed by the trial court.

¶ 64    Affirmed.