NOTICE
Decision filed 01/29/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 231343-U

NO. 5-23-1343

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Washington County. |
| | ) | |
| v. | ) | No. 23-CF-1 |
| | ) | |
| JOSEPH D. SMITH, | ) | Honorable |
| | ) | Eugene E. Gross, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Presiding Justice Cates and Justice Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's 100-year aggregate sentence for two counts of predatory criminal sexual assault and one count of aggravated criminal sexual abuse was not excessive.

¶ 2    Defendant, Joseph D. Smith, appeals from his sentence, arguing the cumulative 100 years of imprisonment is excessive. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    On January 3, 2023, defendant was charged, through information, with two counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2022)). The first count concerned D.M., and the second count regarded A.M. A grand jury indicted defendant on the same charges on January 9, 2023.

1

¶ 5    On April 4, 2023, through a superseding bill of indictment, the State charged defendant with seven counts. Counts I through III charged defendant with predatory criminal sexual assault of a child (*id.*), occurring on or about August 19, 2022, through August 23, 2022. Count I concerned an act of contact, however slight, between defendant and D.M.'s sex organs, for the purposes of sexual gratification or arousal. Count II regarded defendant contacting D.M.'s sex organ with his hand for the purposes of sexual gratification or arousal. Count III concerned an alleged contact between defendant's mouth and D.M.'s sex organ. Count IV charged defendant with aggravated criminal sexual abuse (*id.* § 11-1.60(b)), for fondling D.M.'s breasts. Counts V through VII charged defendant with predatory criminal sexual assault of A.M. (*id.* § 11-1.40(a)(1)), occurring on or about April 27, 2022, through August 23, 2022. Count V regarded contact between defendant and A.M.'s sex organs. Count VI concerned contact between defendant's sex organ and A.M.'s buttocks. Count VII regarded contact between defendant's hand and A.M.'s sex organ.

¶ 6    The jury trial began on April 26, 2023. The evidence at trial showed that defendant was married to Christina, who had three daughters prior to her marriage with defendant. Her daughters were D.M., A.M., and M.M. In 2020, early in their relationship, defendant, Christina, and her children lived in Salem, Illinois. In November 2021, they moved to Walnut Hill, Illinois, to Christina's father's house. In the summer of 2022, the family moved to Ashley, Illinois.

¶ 7    On August 24, 2022, D.M. was crying at recess and a few of her friends inquired. D.M. disclosed to her friends that defendant had "raped her." After her friends convinced her to tell an adult, D.M. disclosed to her teacher's aide, Donna Hicks, that defendant touched her breasts and private parts. D.M. also told Hicks that defendant sexually abused her sister, A.M., and that

2

defendant had stated her youngest sister, M.M., was still too young, and he would wait for her. Hicks notified the Department of Children and Family Services (DCFS).

¶ 8        Sarah Ivy, an investigator at DCFS, responded and came to the school to meet with D.M. and A.M. She also met Christina with law enforcement present. Ivy asked Christina whether she could keep the girls safe. Specifically, Ivy wanted to create a safety plan and determine whether Christina could stay in the home without the defendant. Christina agreed and returned home with the girls. Ivy went to the family's home and created a safety plan with Christina there. The safety plan required defendant to no longer live in the house and have no contact with the children. Ivy also requested that Christina take D.M. to the hospital for a sexual assault examination and scheduled interviews for the children at the Child Advocacy Center (CAC) at the Amy Schulz Center in Mt. Vernon, Illinois, the next day.

¶ 9        Thereafter, Christina took D.M. to St. Mary's Good Samaritan Hospital in Mt. Vernon, Illinois. Crystal Stone, a sexual assault nurse examiner (SANE) and resource nurse at Midwest Emergency Department Services, conducted the sexual assault examination of D.M. During her examination, D.M. stated that defendant came into her room at night and touched "her in ways that she did not like." D.M. stated it occurred every day when her mother was in bed. Stone began her examination with a "head to toe" assessment. As she conducted her examination, she was using swabs to collect potential evidence. As she swabbed D.M.'s breasts, D.M. stated that defendant "touches me there all the time" and that he touches both breasts "at the same time." Stone observed a green circular bruise on D.M.'s right upper arm and D.M. stated the injury resulted from her hiding under her bed from defendant. Stone then performed an anorectal examination and a genital exam. This examination revealed significant redness over D.M.'s entire vulva, but there were no

3

abrasions or lacerations. Stone explained that this inspection involves looking at the outside of the vaginal area, as opposed to a vaginal exam, which uses a speculum and is more invasive.

¶ 10    Out of the swabs taken during D.M.'s sexual assault examination, only the vaginal swab contained enough male DNA for further testing. No male DNA was detected in the oral or anal swabs, and the perioral swab contained too high of a female to male ratio that further testing could not be completed. Testing of the vaginal swab revealed that male DNA was approximately 1.2 octillion times more likely to belong to defendant than an unknown, unrelated individual.

¶ 11    On August 27, 2022, despite the safety plan's conditions, Deputy Sheriff Eden Lisk reported that he observed defendant with Christina in the family van parked in Du Bois, Illinois. During the children's CAC interview, on August 29, 2022, officers discovered defendant sitting in his van in the parking lot of the Amy Schulz Center. Initially, defendant lied about his identity. However, soon after, officers discovered that defendant drove Christina and the girls to the CAC interview. After Ivy discovered that Christina and defendant violated the safety plan numerous times, the children were brought into protective custody and placed with their grandparents in Walnut Hill. Due to environmental concerns at the grandparents' home, they were later placed with a non-relative foster family.

¶ 12    In the recording of D.M.'s CAC interview, D.M. stated that defendant always tried to touch "where he was not supposed to." She specified that he had touched her breasts and the outside and inside of her vagina. D.M. also stated that defendant made D.M. touch his penis and defendant put his mouth on her vagina and breasts. Defendant also put his penis in her vagina. D.M. averred the abuse occurred every night.

¶ 13    At trial, D.M. testified that defendant touched his mouth to the inside of her private parts while she was naked. The abuse occurred almost every night in her bedroom when her mom was

4

asleep. D.M. stated that defendant also touched her private part and breast with his hand while she was naked. She also stated that she was stressed and a little scared to testify at trial.

¶ 14     During A.M.'s CAC interview on August 27, 2022, she did not disclose any abuse. However, in September 2022, when the girls lived with their grandparents at Walnut Hill, A.M. disclosed defendant's sexual abuse to her grandfather and school counselor. As a result, DCFS was notified and a DCFS interviewer questioned A.M. at her school. At this interview, A.M. disclosed that defendant digitally penetrated her vagina. The abuse first occurred when the family lived with Christina's parents in Walnut Hill and continued thereafter. A second CAC interview of A.M. occurred on November 18, 2022, and A.M. admitted that defendant sexually abused her. A.M. stated that she did not disclose the initial abuse because she was scared.

¶ 15     At trial, A.M. testified that defendant sexually abused her about once a week. The abuse included defendant's hands or penis touching the inside and outside of A.M.'s vagina, sometimes without clothes. She further testified that defendant told her he also abused D.M. She observed defendant touch D.M. once while D.M. and defendant were naked. After she and D.M. disclosed the abuse, A.M. stated that defendant hid under their porch when the police were at their home. A.M. stated the abuse started when she first lived with her grandmother and grandfather in Walnut Hill. The abuse also occurred when they lived in Salem and Ashley. The abuse also occurred two to four times inside the family's van. She also testified that defendant used his phone to show her pictures and videos of girls and boys who were naked. When asked if her dad ever put his penis on her buttocks, A.M. answered affirmatively and stated that occurred in Salem and Ashley. Both times, they did not have their clothes on, and he touched both inside and outside of her buttocks. A.M. admitted initially telling the CAC interviewer that no one had ever done anything inappropriate to her body, and she did not know if anything happened inappropriately to someone

5

she knew. She stated that she lied at first because she was scared to admit the truth and after thinking about it, she realized she would get into even more trouble for lying.

¶ 16    Evidence at trial also revealed that on January 7, 2023, after defendant had been taken into custody, defendant required medical attention. He was transported to Washington County Hospital. While at the hospital, defendant asked the chaperoning officer for a tissue that was in another room. Once the officer left the room, defendant got out of the hospital bed and ran. The officer unsuccessfully attempted to grab defendant, and defendant ran out of the back of the hospital. Officers eventually had to use a taser to stop defendant. Additionally, while incarcerated, defendant also tried to contact Christina through letters. Moreover, defendant's sister called Christina a few weeks prior to trial and said that defendant's case would be dismissed if the girls did not show up to court.

¶ 17    At the conclusion of all the evidence and instructions to the jury, the jury found defendant guilty of counts I, II, and IV. It found defendant not guilty of count III and all counts concerning A.M. (counts V-VII). On May 30, 2023, defendant filed a motion for a new trial and/or entry of judgments notwithstanding the verdicts.

¶ 18    The presentence investigation (PSI) report was filed May 10, 2023, and provided a detailed list of defendant's criminal history. On October 16, 2004, in Jefferson County, Kentucky, defendant was charged with seven offenses. In the same case, on May 15, 2007, defendant pled guilty to first degree assault, first degree robbery, burglary, tampering with physical evidence, and intimidating a participant in the legal process. He was sentenced to 15 years of imprisonment. On June 27, 2012, in Anne Arundel County, Maryland, defendant pled guilty to felony theft and was sentenced to four years' imprisonment. In July 2012, defendant was sentenced to 30 days in jail for a theft of credit charge in Taylor County, Kentucky. In November 2012, in Taylor County,

Kentucky, defendant was charged with third degree burglary and theft of an automobile and was eventually sentenced to two years' imprisonment. On April 26, 2013, in Anne Arundel County, Maryland, defendant pled guilty to burglary in exchange for the dismissal of 16 other charges and a sentence of five years' imprisonment. On March 4, 2017, in Taylor County, Kentucky, defendant was charged with two counts of second degree burglary. In the same case, defendant pled guilty to amended charges and was sentenced to 12 months' jail time, which was suspended with a sentence of 24 months' probation. From July 12, 2018, to July 2, 2019, defendant accrued four more convictions regarding traffic offenses in Marion County, Illinois, including speeding, operating an uninsured motor vehicle, and improper parking. On October 29, 2019, defendant pled guilty to aggravated battery with a deadly weapon in exchange for a sentence of 24 months' conditional discharge and the dismissal of a criminal damage to government property charge. Defendant also had an October 2019 conviction for speeding in Jefferson County, Illinois, and a pending case in Williamson County, Illinois, for driving while license suspended, operating an uninsured motor vehicle, and operating a vehicle with a suspended registration.

¶ 19      The PSI report also stated that defendant reported that he remembered watching his mother be arrested for writing bad checks. His mother also drank alcohol and used methamphetamine in front of him. DCFS removed him and his sister from his mother's care when he was nine years old. Defendant also reported obtaining his general equivalency diploma, and an electrical apprenticeship in 2012.

¶ 20      The interviewer verified that defendant was employed at Bonnie Cafe in Bonnie, Illinois, from November 2022 until the date of his arrest. The owner of Bonnie Cafe stated that defendant was a good worker and got along with his coworkers. Prior to working at Bonnie Cafe, defendant worked at the Lantern Pub in Ashley, Illinois, from April 2022 through September 2022. The

manager of Lantern Pub stated that defendant was an excellent employee until he was accused of sexual abuse. Thereafter, defendant was an "emotional wreck" and stopped showing up to work. Prior to the Lantern Pub, defendant worked at an electrical contractor for about two weeks sometime in 2021. In 2019, he was employed at Tate's Mobile Transport for 10 months and was injured at work. Defendant never returned to work and "quit via text message and email." The office manager for Tate's Mobile Transport reported that defendant began acting oddly in October 2019. After defendant threatened to sue the company, she eventually filed an emergency no contact order against defendant on November 7, 2019.

¶ 21    Defendant reported that he had depression since he was 13 years old and insomnia since he was 30 years old. He also stated that he attempted to commit suicide in 2016, two days after he found out that his close friend committed suicide. None of this information could be verified.

¶ 22    The PSI report noted that defendant had a large bandage wrapped around his left forearm at the time of the interview, and defendant stated that he had 10 stitches from attempting suicide. Defendant averred that he had attempted suicide several times, and the report noted that defendant appeared to be in a poor state of mental health. The PSI report verified that defendant attempted suicide on April 28, 2023, April 29, 2023, April 30, 2023, and May 2, 2023, while in jail. On May 5, 2023, defendant was admitted into Gateway Medical Center in Granite City, Illinois, but returned to jail on May 8, 2023. The interviewer requested records from Gateway, but no records were received.

¶ 23    At the outset of the June 6, 2023, hearing set for sentencing, the trial court denied defendant's motion for a continuance of the sentencing hearing. Defense counsel claimed that the State had dumped hundreds of pages of documents on defendant just days before trial. Additionally, defendant had not been told that the State was in possession of the cell phone which

was allegedly used to show the girls videos. Defense counsel wanted the content of the phone analyzed. The trial court found these arguments unavailing, indicating that the defendant could have asked for a continuance of the trial, but chose not to do so because of his speedy trial rights. The trial court denied the motion to continue.

¶ 24 Next, defense counsel presented his posttrial motion. After argument, that motion was also denied. The trial court and the parties then proceeded to sentencing. Defense counsel noted that the PSI had the wrong year for defendant's birthday, stating he was born May 1, 1989. The State admitted a certified copy of defendant's felony burglary conviction in Anne Arundel County, Maryland, and felony aggravated battery conviction in Jefferson County, Illinois. The parties and court conferred and then agreed that the potential aggregate sentence for all convictions was 12 to 120 years' imprisonment.

¶ 25 The State argued that the aggravating factor of causing or threatening serious harm was present where it offered evidence of the mental and emotional decline of D.M. due to defendant's abuse. Defense counsel objected, arguing there was no evidence presented at the sentencing hearing to indicate D.M.'s mental health issues were a result of defendant's alleged actions. The trial court asked if mental harm was inherent in the offense of predatory criminal sexual assault. The State answered, "It's absolutely inherent in the nature." When the trial court asked if the State was arguing an aggravating factor or the nature and circumstances of the particular offense, the State asked the court to give its argument the weight the trial court found deserving.

¶ 26 The State further contended defendant's lengthy criminal history was an aggravating factor, as well as the fact that defendant tried to flee while in custody on this charge. The State argued the aggravating factor of defendant holding a position of trust or supervision was applicable as he was the stepfather of the victim. The State also claimed that the PSI showed that defendant

9

had no remorse and continued to deny the allegations despite the DNA evidence. The State asserted there was a necessity to deter others from committing the same crime, and requested the court impose the maximum sentence.

¶ 27    Defense counsel argued he had received nothing to indicate that D.M.'s mental health issues were the result of defendant's actions. Counsel reminded the trial court that defendant was only convicted of the offenses related to D.M., and thus, the jury did not believe A.M. He argued that it was not that defendant lacked remorse, but that defendant believed he was innocent and unjustly convicted. Counsel noted defendant had his own mental health issues after the verdict. He argued defendant's age favored a sentence closer to the minimum. Counsel asked the court not to consider what may have happened to A.M. and requested it impose a sentence "on the low end or less than 20 years." Although given the opportunity, defendant did not provide a statement in allocution.

¶ 28    The trial court stated it considered the nature and circumstances of the case and the record. It found that all victims of predatory criminal sexual assault are caused or threatened serious harm. It therefore did not find the psychological harm was an aggravating factor but would consider it as a part of the circumstances and nature of this particular offense. The court observed defendant's obstructionist pattern throughout the investigation and trial, specifically noting that he took the victims to their CAC interview, made contact through a relative in an attempt to make the girls not appear at trial, escaped from custody, and had attempted suicide subsequent to the jury's guilty verdict.

¶ 29    In imposing sentence, the trial court stated, "I find there are no factors in mitigation. I've went through each individual one and considered each potential factor in mitigation, and I don't believe any factor in mitigation applies." In aggravation, the trial court found the following

10

statutory aggravating factors applicable: (1) defendant's substantial criminal history, (2) the necessity to deter others from committing the same crime, and (3) defendant held a position of trust over the victim. The court reiterated, "There's only one victim in the case because he was acquitted of the second victim." It then sentenced defendant to 50 years' imprisonment on count I, to run consecutively to the 50-year sentence for count II, which would both run concurrently with the 7-year sentence for count IV.

¶ 30    On July 6, 2023, defendant filed a motion to reconsider his sentence, arguing *inter alia* that the sentences were excessive. At the December 5, 2023, hearing on the motion, defendant argued that the 50-year sentences were excessive based on defendant's previous criminal record and that defendant was found not guilty with respect to A.M. Defense counsel stated, "this isn't a murder case, but in essence, he got a higher sentence than he could have got if a murder had been committed." Defense counsel argued a lesser sentence would be more in line with the facts and circumstances of this case.

¶ 31    The trial court found the sentence was "authorized and appropriate" considering the nature and circumstances of the case and all of the factors in aggravation and mitigation. It therefore denied defendant's motion to reconsider.

¶ 32                                    II. ANALYSIS

¶ 33    On appeal, defendant contends that his 100-year aggregate sentence was excessive and the sentence was disproportionate to the harm caused by defendant's conduct. Ill. Const. 1970, art. I, § 11. Specifically, he contends the court erroneously found that the record contained no mitigating evidence where the PSI showed that defendant had a traumatic childhood, suffered from mental health issues, was employed, and obtained his general equivalency degree (GED). Defendant further argues that although he had a lengthy criminal background, his criminal background

11

provided proof of his rehabilitative potential because the seriousness of his offenses substantially decreased over time. As additional support, defendant argued his 100-year aggregate sentence was four times more than the 25-year sentence offered by the State as part of a previous guilty plea offer.

¶ 34     Most of defendant's arguments were not presented in his motion to reconsider his sentence or the hearing concerning such motion. Defendant's motion to reconsider simply stated the sentence was excessive. At the motion to reconsider hearing, defense counsel made further arguments regarding defendant's criminal history and the fact that defendant was found innocent of the sexual abuse concerning A.M.

¶ 35     To properly preserve a sentencing issue, a defendant must include the issue in a postsentencing motion. *People v. Stewart*, 2022 IL 126116, ¶ 11. The failure to preserve an issue results in forfeiture of the issue on appeal. *Id.*

¶ 36     While defendant here presented a general claim of an excessive sentence in his motion, no specific errors in this respect or facts supporting his position are listed. A general claim of error without stating the specific basis for such error is insufficient to preserve the issue for appeal. *People v. Camp*, 128 Ill. App. 3d 223, 233 (1984); see *People v. Woods*, 214 Ill. 2d 455, 470 (2005); *People v. Bair*, 379 Ill. App. 3d 51, 57 (2008). As noted above, defense counsel provided further argument regarding defendant's criminal history and requested the court reduce the sentence to be more in line with the facts and circumstances of the case. However, defense counsel did not contend the court improperly found there was no mitigation or failed to consider a mitigating factor. Moreover, at no time during the motion to reconsider hearing did defendant discuss his traumatic childhood, mental health issue, previous plea offer, employment, or GED.

12

Defendant did not even assert these arguments to the court during the sentencing hearing, except for the decline of his mental health since being charged in this case.

¶ 37    The purpose behind requiring a defendant to properly preserve an error is to allow "the trial court an opportunity to review a defendant's claim of sentencing error," "save the delay and expense inherent in appeal if the claim is meritorious," and "prevent a litigant from asserting on appeal an objection different from the one he advanced below." *People v. Heider*, 231 Ill. 2d 1, 18 (2008). This purpose would be absconded if we were to address whether the court improperly found no mitigation, as the trial court did not have an opportunity to explain its statement or correct any error where defendant did not raise the issue. For the same reasons, the purpose of rule was also not met for defendant's comparison between the sentence imposed after his guilty plea and the current sentence. Accordingly, because these issues were not presented to the sentencing court and not raised in defendant's motion to reconsider, they are forfeited. See *People v. Lanning*, 2025 IL App (5th) 230406-U, ¶¶ 31, 39 (arguments regarding specific sentencing factors that were not raised in the postsentencing motion were forfeited, despite asserting excessive sentencing claims in the postsentencing motion); *People v. Orozco*, 2023 IL App (3d) 210529-U, ¶¶ 8-11 (same); *People v. Fenner*, 2024 IL App (1st) 230645-U, ¶¶ 26, 87 (same); *People v. Yelm*, 2023 IL App (2d) 210095-U, ¶ 91 (finding an argument that the sentence was excessive "under the circumstances" was an "undeveloped assertion" insufficient to preserve the issue for review).

¶ 38    While an individual proportionate penalties claim was not presented below, we note that defendant's proportionate penalties argument and excessive sentence argument are one and the same in that defendant's sentence was disproportionate. *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 28 (a sentence within the applicable statutory range will not be reversed unless the sentence "greatly varies from the spirit and purpose of the law or is manifestly disproportionate to

the nature of the offense"); *People v. Clark*, 2023 IL 127273, ¶ 51 ("A defendant's sentence violates the proportionate penalties clause where, among other circumstances, the penalty imposed is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." (Internal quotation marks omitted.)). As such, we find the trial court had the opportunity to address whether the sentence was disproportionate to the nature of the offense. However, to extent that defendant attempts to assert a proportionate penalties argument separate from his excessive sentence claim raised below, it is forfeited. *Lanning*, 2025 IL App (5th) 230406-U, ¶¶ 31, 39 (arguments regarding specific sentencing factors that were not raised in the postsentencing motion were forfeited, despite asserting excessive sentencing claims in the postsentencing motion); *Orozco*, 2023 IL App (3d) 210529-U, ¶¶ 8-11 (same); *Fenner*, 2024 IL App (1st) 230645-U, ¶¶ 26, 87 (same); *Yelm*, 2023 IL App (2d) 210095-U, ¶ 91 (finding an argument that the sentence was excessive "under the circumstances" was an "undeveloped assertion" insufficient to preserve the issue for review).

¶ 39    While there are exceptions to the forfeiture rule, defendant presented no argument on appeal as to why this court should excuse defendant's forfeiture of his arguments. See *People v. Roman*, 2013 IL App (1st) 102853, ¶ 19. Accordingly, these contentions are forfeited (see *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010)), and we address only the preserved arguments on appeal related to defendant's criminal history and the general argument that his sentence was excessive.

¶ 40    The proportionate penalties clause provides, "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. In determining the sentence, the trial judge must consider all relevant factors in mitigation and aggravation, and "balance the retributive and rehabilitative purposes of the punishment." (Internal quotation marks omitted.) *People v. Weiser*, 2013 IL App

14

(5th) 120055, ¶¶ 31-32. The trial judge is afforded substantial deference in sentencing, because—unlike a reviewing court—it has an opportunity to weigh such factors as "defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. A reviewing court cannot reweigh the aggravating and mitigating factors in reviewing a sentence, nor can it "substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). A sentence that falls within statutory limits is presumed proper. *Etherton*, 2017 IL App (5th) 140427, ¶ 28. The presumption is rebutted only where a defendant demonstrates that the sentence imposed "greatly varies from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *Id.*

¶ 41    A person who commits a predatory criminal sexual assault is guilty of a Class X felony and is subject to term of imprisonment not less than 6 years and no more than 60 years' imprisonment. 720 ILCS 5/11-1.40(b)(1) (West 2022). Pursuant to section 5-8-4(d)(2) of the Unified Code of Corrections (730 ILCS 5/5-8-4(d)(2) (West 2022)), the court was required to impose mandatory consecutive sentences for the offenses of predatory criminal sexual assault. A person who commits aggravated criminal sexual abuse is guilty of a Class 2 felony (720 ILCS 5/11-1.60(g) (West 2022)), which is subject to no less than three and no more than seven years' imprisonment or probation not exceeding four years. 730 ILCS 5/5-4.5-35(a), (d) (West 2022). The court here sentenced defendant to 50 years for each predatory criminal sexual assault conviction and 7 years for the criminal sexual abuse conviction. Because the sentences were within the statutory range, we presume the sentences were proper.

¶ 42    In announcing its judgment, the court explicitly found applicable the statutory aggravating factors of criminal history, the necessity to deter others from committing the same crime, and the

15

holding of a position of trust over the victim. Defendant does not dispute the applicability of the latter considerations but argues, nevertheless, that his sentence was excessive and his criminal history should have been viewed as evidence of his rehabilitation. We find his latter argument illogical.

¶ 43    The absence of a criminal history is a mitigating factor (see 730 ILCS 5/5-5-3.1(a)(7) (West 2022)) but having a history of criminal activity is a statutorily enumerated aggravating factor. *Id.* § 5-5-3.2(a)(3). Defendant has committed numerous crimes since 2004. Although his most recent offenses were less severe than his older criminal history, it remains that defendant has repeatedly violated the law throughout his life despite the numerous previous opportunities for rehabilitation. As such, his established history of disregarding the law and reoffending in no way demonstrates rehabilitative potential. Defendant's criminal history was therefore a proper aggravating factor. See *id.*

¶ 44    In addition to the defendant's criminal history, we find that the sentence was not excessive, as he also held a position of authority over D.M. The evidence at trial further showed that defendant repeatedly sexually abused D.M. After the sexual abuse was disclosed, defendant continued to make poor decisions by attempting to escape and violating the safety plan. The sentencing court was not required to attribute more weight to defendant's rehabilitative potential than the aggravating factors. *Weiser*, 2013 IL App (5th) 120055, ¶ 32. Thus, under the facts and circumstances of this case, we find the sentences in this case comport with the purpose and spirit of the law and are not disproportionate. We therefore affirm his sentences.

¶ 45                                III. CONCLUSION

¶ 46    Defendant's criminal history did not show rehabilitative potential, and his sentences were not excessive. Accordingly, we affirm the sentences.

16

¶ 47    Affirmed.